IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| GREGORY RENALDO THOMPSON, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | Civil Action No. 4:15-CV-189-O |
| | § | |
| LORIE DAVIS, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

## OPINION AND ORDER

Before the Court is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by Petitioner, Gregory Renaldo Thompson, a state prisoner confined in the Correctional Institutions Division of the Texas Department of Criminal Justice (TDCJ), against Lorie Davis, Director of TDCJ, Respondent. After considering the pleadings and relief sought by Petitioner, the Court has concluded that the petition should be denied.

## I. BACKGROUND

The state appellate court summarized the background of the case as follows:

Appellant and Paula West married in 1996. The relationship was rocky, and the couple separated and reunited three times before West left Appellant for the last time in March 2010. In June 2010, West began dating Terry Ross, with whom she previously had a business relationship.

In December 2010, West filed for divorce from Appellant. West stated that Appellant "constantly threatened . . . that he would hurt [West] or kill [her]." Indeed, Appellant told West's nephew that if Appellant saw Ross and West together, West's family "was going to be singing a sad song."

On January 23, 2011, Ross called Appellant with West listening in without Appellant's knowledge. During the call, Appellant angrily threatened Ross: "I will [expletive] you up and leave my family alone." Two days later on January 25, 2011,

West and Ross called Appellant and Appellant again threatened Ross. When West mentioned the divorce petition, Appellant stated, "If I go to court Monday and go downtown Fort Worth and find out you filed that divorce, that's going to be the worst thing you've done."

The same day, West spent the night with Ross at his home. Her car, which she had owned during her marriage to Appellant, was parked in Ross's driveway next to Ross's truck. At 1:15 a.m. on January 26, West's cell phone rang, but she did not answer when she saw Appellant was the caller. Appellant left an irate voicemail: "I don't know what crazy game you're playing." West decided she should leave and spend the night at her sister's house.

Ross went outside to warm up West's car. When West's car would not start, Ross came back inside to tell West that he was going to jump her car battery. After Ross returned outside, West heard an angry voice outside near Ross's driveway say, "[Expletive] you mother [expletive]." She called 911 and reported that Appellant was involved in a disturbance outside Ross's home. West stepped outside but saw nothing and only heard her car and Ross's truck running. West went back inside and locked the door.

Although West admitted she never told Appellant she and Ross were dating, she averred that Appellant had seen Ross and West together. Appellant testified at trial and denied ever threatening Ross or knowing that Ross and West were dating. Appellant admitted that he had parked his 18-wheeler truck on a highway service road near Ross's house at the time of the murder. He asserted he was walking to Ross's house to spend the night there, which he occasionally did. Appellant stated he was unarmed at the time. As Appellant approached Ross's house and saw Ross working on his truck, Appellant averred that Ross attacked him with no provocation. Appellant testified that during the ensuing fight Ross brandished "some kind of object" and that Appellant bit Ross's hand struggling for control of the object. Appellant claimed that Ross began choking Appellant at some point and that Appellant grabbed Ross around his throat "to try to figure out why he's doing this." Appellant finally was able to wrest the object away from Ross (which Appellant noticed was a box cutter), backhanding Ross to knock him away, and he then went back to his truck. Although he was not angry when he approached Ross's house, Appellant testified that he was scared, upset, and confused about being attacked. Once Appellant got to his truck, he saw that his leg was cut and bleeding. Appellant, however, "drove away" and headed to Oregon where he was scheduled to make a truck delivery. Along the way, Appellant admitted that he threw away the clothes he was wearing (and, presumably, the box cutter) because they were bloody.

When the police arrived at Ross's home, they found Ross dead and lying in the street. Ross's throat had been slashed from ear to ear, completely severing his

trachea, carotid artery, and jugular vein. In short, Ross almost had been decapitated. Ross had defensive cuts on his hands, and his right forearm had been severely gashed, severing the muscle. One of the investigating police officers believed that "there was a lot of rage involved in that killing."

Appellant was arrested in Utah on January 27, 2011. He had a deep stab wound on his leg as well as scratches and bite marks. Three of his teeth were loose from the fight. He was later indicted for Ross's murder. After the conclusion of the guilt-innocence phase of trial, the court instructed the jury on the defense of self-defense. The jury found Appellant guilty of murder, implicitly rejecting self-defense, and the trial proceeded to the punishment phase before the same jury. Before the trial court charged the jury on punishment, Appellant timely requested an instruction on sudden passion, which the trial court denied. The jury assessed Appellant's punishment at sixty years' confinement.

*Id.,* Mem. Op. at 1-5, ECF No. 10-4 (footnotes omitted).

On direct appeal, Petitioner raised one point alleging the trial court erred by refusing to submit the special issue of sudden passion to the jury at the punishment phase of his trial. The appellate court rejected the argument and affirmed the trial court's judgment and the Texas Court of Criminal Appeals refused Petitioner's petition for discretionary review. *Id.* at 5, 14 & "Status Letter," ECF No. 10-25.

## II.  ISSUES

In one ground, Petitioner raises the same claim in this federal petition. Pet. 6, ECF No. 1.

## III.  RULE 5 STATEMENT

Respondent believes that the petition is neither barred by the statute of limitations nor successive and that the claim has been sufficiently exhausted in state court. Resp't's Ans. 6, ECF No. 7.

3

## IV.  DISCUSSION

### A.  Legal Standard for Granting Habeas-Corpus Relief

A § 2254 habeas petition is governed by the heightened standard of review provided for in the Anti-Terrorism and Effective Death Penalty Act (AEDPA).  28 U.S.C. § 2254.  Under the Act, a writ of habeas corpus should be granted only if a state court arrives at a decision that is contrary to or an unreasonable application of clearly established federal law as established by the Supreme Court or that is based on an unreasonable determination of the facts in light of the record before the state court. 28 U.S.C. § 2254(d)(1)–(2); *Harrington v. Richter,* 562 U.S. 86, 100 (2011).  This standard is difficult to meet and "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Harrington*, 562 U.S. at 102.  Additionally, the statute requires that federal courts give great deference to a state court's factual findings. *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct.  A petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *Williams v. Taylor*, 529 U.S. 362, 399 (2000).

### B.  Discussion

In affirming the trial court's judgment, the state appellate court addressed the issue as follows:

### II. SUDDEN-PASSION INSTRUCTION

During the punishment phase, a defendant may raise the issue as to whether he caused the death of an individual "under the immediate influence of sudden passion arising from an adequate cause." TEX. PENAL CODE ANN. § 19.02(d) (West 2011). If the defendant can prove the issue of sudden passion by a preponderance of the evidence, the offense is a felony of the second degree rather than of the first

4

degree. *Id.; Trevino v. State,* 100 S.W.3d 232, 237 (Tex. Crim. App. 2003). "Sudden passion" is "passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." TEX. PENAL CODE ANN. § 19.02(a)(2). "Adequate cause" is "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.* § 19.02(a)(1). The defendant has the burden of production and persuasion with respect to the issue of sudden passion. *Wooten v. State,* 400 S.W.3d 601, 605 (Tex. Crim. App. 2013) (9-0 decision); *see* TEX. PENAL CODE ANN. § 19.02(d).

A jury instruction on sudden passion should be given if the evidence at least minimally supports an inference that (1) the defendant acted under the immediate influence of an emotion such as terror, anger, rage, or resentment; (2) his sudden passion was in fact induced by the victim's provocation, which would commonly produce such a passion in a person of ordinary temper; (3) he committed the murder before regaining his capacity for cool reflection; and (4) a causal connection existed between the provocation, the emotion, and the murder. *Wooten,* 400 S.W.3d at 605. The evidence must be viewed in the light most favorable to the requested defensive instruction. *See Bufkin v. State,* 207 S.W.3d 779, 782 (Tex. Crim. App. 2006). Even if the evidence is "weak, impeached, contradicted, or unbelievable," a sudden-passion instruction is warranted as long as the evidence is not "so weak, contested, or incredible that it could not support such a finding by a rational jury." *McKinney v. State,* 179 S.W.3d 565, 569 (Tex. Crim. App. 2005); *See Trevino,* 100 S.W.3d at 238. Therefore, a defendant's testimony alone is sufficient to raise a defensive issue requiring an instruction in the charge. *Shaw v. State,* 243 S.W.3d 647, 662 (Tex. Crim. App. 2007), *cert. denied,* 553 U.S. 1059 (2008). Importantly, evidence that the defendant acted in response to provocation with no evidence that the defendant was acting under the immediate influence of sudden passion at the time of the murder is insufficient to support a sudden-passion instruction. *Trevino,* 100 S.W.3d at 241.

### III. APPLICATION

#### A. Error

Appellant argues that his "version of events did evoke the emotion of terror sufficient to render his mind incapable of cool reflection":

> [Appellant] had no idea that [Ross] and [West] were an item. He had no reason to believe that his wife was inside the residence. His state of mind at the onset of [Ross's] attack is equally understandable to anyone. Perplexed, frightened, and terrified are adjectives that seem appropriate. When he realized that [Ross] was

trying to kill him with a box cutter[,] the jury could have easily believed that Appellant's fear and terror were sufficient to render his mind incapable of cool reflection because of [Ross's] unprovoked attack. Appellant's testimony was sufficient to raise the defense of sudden passion arising out of an adequate cause. The jury had a right to consider this defensive issue when assessing Appellant's punishment.

Indeed, "[s]elf-defense, if the defendant's fear rises to the level of terror sufficient to render the mind incapable of cool reflection, could give rise to a . . . mitigation instruction." 6 Michael B. Charlton, *Texas Practice Series: Criminal Law* § 10.2 (2d ed. 2001). The State retorts that Appellant's evidence shows that he was "capable of appraising and reflecting on his situation" and that his emotions were not sufficiently high to justify a sudden-passion instruction.

Viewing the evidence supporting the sudden-passion argument, Appellant sufficiently raised the affirmative defense. Appellant was unaware of Ross and West's relationship and had not previously threatened Ross. Appellant would stay with Ross from time to time, even going so far as to assist Ross with the rent on the home. When he approached Ross's house unarmed on the night of the murder, West's car was in the driveway parked next to Ross's truck. Ross ran at Appellant, hit Appellant in the face, and attacked him with a box cutter. A physical struggle ensued, with Ross attempting to choke Appellant. During the fight to gain control of the box cutter, Appellant's leg was cut, but he did not know if Ross was hurt. Appellant pushed Ross away while gripping the box cutter and then ran away.

Although Appellant stated that, during the fight, he was attempting to determine why Ross was attacking him, this testimony does not equate to the "cool reflection" needed to negate the need for a sudden-passion instruction. This case is distinguishable from *Daniels,* which the State cites in support of its argument that Appellant was not subject to sudden passion. *Daniels v. State,* 645 S.W.2d 459, 460 (Tex. Crim. App. 1983). In *Daniels,* the defendant testified that he was afraid the victim was going to kill him and he knew he had to kill the victim to escape the attack but that he was "in full control." *Id.; see also Wooten,* 400 S.W.3d at 607 n.33 (discussing *Daniels* ).

Here, Appellant was not capable of cool reflection under the facts as viewed in the light most favorable to the presence of sudden passion. Appellant was not in control of the situation. Indeed, he did not know why Ross was attacking him or if Ross was hurt in the struggle. He was unaware Ross and West were romantically involved, but West's car was in Ross's driveway early in the morning. Appellant testified he was scared, upset, and confused. After Appellant ran away, he attempted to continue hauling a load to Oregon. Once he determined his cell phone was not

6

working, he stopped in Utah and called his uncle from a truck stop who informed Appellant, to Appellant's surprise, that he was being sought for capital murder. By this point, police officers arrived at Appellant's location and arrested him. *See, e.g., Trevino,* 100 S.W.3d at 239 (considering appellant's demeanor after murder as supportive evidence to justify sudden-passion instruction). An unprovoked, violent attack with a box cutter is sufficient provocation to induce the requisite emotional state in a person of ordinary temperament to justify a sudden-passion instruction. *See Moore v. State,* 969 S.W.2d 4, 11 (Tex. Crim. App. 1998) (holding evidence that murder occurred during violent fight, including victim's attempt to run appellant over with a car, sufficient to raise sudden passion); *cf. McKinney,* 179 S.W.3d at 570-71 (holding victim shouting at and pushing appellant before appellant shot victim insufficient evidence of sudden passion); *Reese v. State,* 340 S.W.3d 838, 842 (Tex. App.-San Antonio 2011, no pet.) (finding no adequate cause when appellant shot victim "after she walked away from the truck and then backed away from appellant with her hands raised when he approached her with the gun" because not common response by an ordinary person).

Further, Appellant's claim that any injury to Ross was accidental does not preclude a sudden-passion instruction. *See Trevino,* 100 S.W.3d at 240 ("[Appellant] was entitled to the sudden passion charge at punishment because there was some evidence supporting that charge regardless of whether it conflicted with other evidence including some evidence of an accidental shooting."). Likewise, the jury's implicit rejection of the self-defense instruction at guilt-innocence did not, ipso facto, deprive Appellant of the right to a sudden-passion instruction at punishment. *See id.* at 242-43. Appellant's evidence may have been weak and, arguably, could have been impeached by the State's evidence, "[b]ut a defendant is entitled to the sudden passion charge even if the evidence is weak and even if it is contradicted by the State's evidence." *Id.* at 239. The preponderance of the evidence at least minimally supports the inference that Appellant caused Ross's death while under the immediate influence of sudden passion arising from an adequate cause; thus, the trial court erred in failing to so instruct the jury at punishment. *See id.* at 237.

## B. Harm

Although we have found error, our inquiry does not end because we must determine whether that error harmed Appellant. *See Wooten,* 400 S.W.3d at 606. A trial court's failure to include a requested sudden-passion instruction does not, standing alone, equate to a showing of harm. *Id.; see also Trevino,* 100 S.W.3d at 241 ("[A]ccording to the court of appeals, the mere fact that [Appellant] should have received the charge necessarily means that he was harmed by the failure to get it. This statement is essentially a conclusion that harm results per se, an approach that we have rejected."). Therefore, we must review this non-structural error for the requisite harm. *See Payne v. State,* 11 S.W.3d 231, 232 (Tex. Crim. App. 2000) (holding jury-

charge error to be nonstructural). Because Appellant timely objected to the omission of the sudden-passion instruction in the trial court, the error requires reversal if it was "calculated to injure the rights of [the] defendant," which means no more than that there must be *some* harm to Appellant from the error. TEX. CODE CRIM. PROC. ANN. art. 36.19 (West 2006); *Trevino,* 100 S.W.3d at 242 (quoting article 36.19 and *Almanza v. State,* 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)). In other words, a properly preserved error will require reversal as long as the error is not harmless. *Almanza,* 686 S.W.2d at 171; *see Wooten,* 400 S.W.3d at 606 (holding harm analysis of trial court's failure to include sudden-passion instruction governed by article 36.19). In making this determination, "the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Id.; see also Wooten,* 400 S.W.3d at 606 (reiterating harm from exclusion of sudden-passion instruction must be determined "by the record as a whole"). As such, "we focus on the evidence and record to determine the likelihood that a jury would have believed that the appellant acted out of sudden passion had it been given the instruction." *Wooten,* 400 S.W.3d at 606. "[B]urdens of proof or persuasion have no place" in this inquiry. *Warner v. State,* 245 S.W.3d 458, 464 (Tex. Crim. App. 2008).

As stated above, the court of criminal appeals has instructed that a jury's rejection of self-defense alone does not mandate a conclusion that the jury would also reject sudden passion. *Trevino,* 100 S.W.3d at 242. As in *Trevino,* there could be evidence, which was not discredited by the rejection of a self-defense claim, that supports a claim of sudden passion. But if a jury rejects a claim of self-defense, the record as a whole also could demonstrate that Appellant was not harmed by the failure to receive a sudden-passion instruction. *See Wooten,* 400 S.W.3d at 608-10.

The facts of the present case are more consistent with the facts of *Wooten.* In *Wooten,* the appellant claimed that he acted in self-defense and, "[o]nce the shooting began, that he was overwhelmed by emotions of fear, disorientation, [and] confusion." *Id.* at 604. The court of criminal appeals reasoned that

> the same evidence raised both issues, and the jury's rejection of the evidence adduced to show immediate necessity necessarily indicates that it would not have looked favorably upon the appellant's claim *either* that he subjectively experienced the requisite degree of fear *or* that an adequate cause for such a degree of fear existed.

*Id.* at 610 n.45.

Here, the record reveals two competing theories of the murder: (1) Ross attacked Appellant with a sharp weapon with no provocation versus (2) Appellant

brought a sharp weapon to Ross's house to confront him about his relationship with West. Appellant's son and West both testified at punishment that Appellant was abusive and violent, even going so far as to choke West "often" during the marriage. Ross, West, and West's nephew heard Appellant threaten West and Ross. Appellant was known to routinely carry a knife. Although Ross's injuries were severe and gruesome, Appellant stated he did not know if he cut Ross during the struggle. It is important to note that, during its deliberations regarding Appellant's guilt, the jury specifically requested to see the post-mortem pictures of Ross's wounds and the pictures taken of Appellant's wounds after he was arrested. These pictures show that Appellant certainly was not as severely injured as Ross. After this violent fight in which he was injured, Appellant decided to continue with his business and drive to Oregon. When Appellant called his uncle, and later his mother, he did not tell them that Ross had attacked him.

Under the facts of this case, by finding Appellant guilty of Ross's murder, the jury necessarily rejected Appellant's claim of self-defense. Therefore, the jury had to have disbelieved Appellant that his use of deadly force was necessary to defend himself. As the court of criminal appeals concluded in *Wooten,* it is "highly unlikely that a jury that had already rejected the appellant's claim that he reasonably believed that deadly force was immediately necessary to defend himself would nevertheless find in his favor on the issue of sudden passion." 400 S.W.3d at 609. Thus, the record does not show that Appellant suffered any harm as a result of the trial court's failure to give the jury a sudden-passion instruction based on Appellant's assertion that fear and the absence of cool reflection controlled his actions.

Adm. R., Mem. Op. 5-14, ECF No. 10-4 (footnotes omitted).

A petitioner seeking federal habeas corpus review must show a violation of a federal constitutional right. *Lowery v. Collins,* 988 F.2d 1364, 1367 (5th Cir. 1993). "Sudden passion" concerns a state law issue that is not subject to federal habeas review. *Creel v. Johnson,* 162 F.3d 385, 390 (5th Cir. 1998). Federal courts defer to the state courts on whether such an instruction is warranted. *Id.* Regardless of the state law merits of Petitioner's claim, in the course of reviewing state proceedings, federal courts do "not sit as a super state supreme court to review error under state law." *Wood v. Dretke,* 503 F.3d 408, 414 (5th cvir. 2007). "In a non-capital murder case, the failure to give an instruction on a lesser included offense does not raise a federal constitutional issue."

*Valles v. Lynaugh,* 835 F.2d 126, 127 (5th Cir. 1988); *Alexander v. McCotter,* 775 F.2d 595, 601 (5th Cir. 1985). The Fifth Circuit has specifically applied this rule in a habeas case involving the failure to give an instruction on sudden passion. *Taylor v. Scott,* 48 F.3d 529 (5th Cir. 1995). Petitioner has failed to demonstrate that the state court's denial of his claim is contrary to or involves an unreasonable application of clearly established federal law as determined by the Supreme Court or that the state court's denial of the claim constitutes an unreasonable determination of the facts based on the record before the state court. Accordingly, the ground for relief does not provide a basis for federal habeas corpus relief; thus, the petition should be denied.

## V. CONCLUSION

For the reasons discussed herein, Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is **DENIED** and a certificate of appealability is **DENIED**.

**SO ORDERED** on this 28th day of September, 2016.


Reed O'Connor
UNITED STATES DISTRICT JUDGE